Patrick Dahlstrom v. Pomerantz, Inc. We have two basic parts to the appeal this morning. The first has to do with the dismissal of the complaint, our second amended complaint, which is under a de novo review standard. And the second has to do with the denial of our motion under Rule 60B, which has to do with an abuse of discretion standard. We'd like to address the complaint first. If the Court were to rule in our favor on the complaint and reverse, then we don't believe the Court has to address the Rule 60B issue. So I'd like to start with that. This is a complaint that, quite frankly, has an awful lot of support in it. We had nine confidential witnesses who support our allegations, starting from before the class period through the end of the class period, about the fundamental issues that Lifelock was misrepresenting. We have two cases. One was an employment, wrongful employment case that also corroborates information from our confidential witnesses, and a Sox Dodd-Frank whistleblower case that was also filed that also supports, corroborates the allegations of the confidential informants and the basic allegations in our case. Nonetheless, the Court in the route that's going on, its own fact-finding mission, to rule and come to a conclusion that an investor would not believe that Lifelock was misrepresenting its compliance. The Court applied the heightened pleading standards required by the statute, and the statute was passed to correct an obvious abuse that existed previously in this type of cases, where the investors who were in the class that plaintiff's lawyers purported to represent were often the losers in the cases. And isn't that right? And didn't the trial court recognize that and apply the proper standard here, which is the heightened pleading requirement required by the statute that was passed specifically to correct the abuses that were common in this type of case? Well, Your Honor, the Court may have applied the heightened pleading standard. We're not challenging what the standard was. We're challenging the application of it, because in that application, the Court made fact findings that were counter to the allegations in the complaint, which the Court's required to accept as true for purposes of a motion to dismiss. And then applying the standard to that, to its own determination of the facts, then found against us. But we believe that the judge made fact-finding determinations that she shouldn't have made. What's your best example of that? I've got the excerpts up here. One of the best examples has to do with what the company called throttling. Throttling is where this company step back just for a second to explain the basis of it. I understand. Look, we've read all this stuff. We understand throttling. But where I'd like to see that part of Judge Bolton's opinion where you say she went off the rails by fact-finding instead of dealing with just inferences as she's required to do under the heightened pleading standards. Where in the excerpt? I've got it right here. I mean, I don't think that's an unfair question. You just said she did it. No, it's not an unfair question. I'd like to see where she did it. I don't have the site directly to the order. It's in sections where she ---- Well, which order? First, second? It's in the ---- it's in her second order, which affirms her first order. Right. And what she did is she discounted the allegations by claiming that all these were mismanagement and lapses in business. But that isn't the ---- I don't see any place in here where she said I'm finding as a matter of fact or anything close to that. She seems to be dealing with the inferences, which the courts have said we've got to look at all the inferences, measure them up against each other. Where did she say she's finding facts? She doesn't come out specifically and say I'm finding facts. That's my point. That's why I asked you where did she do that. Now you admit she didn't do that. No. I believe that what she's doing is finding facts. She's not saying it. She's characterizing what she says. Absolutely, Your Honor. I'm characterizing what she did as having found ---- making fact findings, choosing between defendant's interpretation of the given set of events and the plaintiff's set of events, and under the ---- what the Court has said is that for purposes of the 12b-6 motion, the Court should take the facts as the plaintiffs present them as true. She knows that. She said that. So is that fact finding or finding reasonable inferences? Are you saying that the Court's determination that the most reasonable or the reasonable inference is this is growing pains, management problems, that that's fact finding, this inference, the inference she drew from the statements in the filings? Yes, because what she did is she uses that to deny that there was a misrepresentation  Isn't that what she's required to do, to determine whether there's a misrepresentation? You look at the statement in the context. There is, but it's supposed to be based on the allegations as presented by the plaintiffs. Okay. So you're saying that she did what she was supposed to do, but she did it wrong? That's what I'm saying. Okay. Thank you. And what I'm saying today is the Court to look at this de novo is to look at what the facts are. I mean, this is a company that had over its head the sword of Damocles. It had to, it was required twice a year to file with the FTC its compliance. During that period, we have, from insiders in the company at the time, that they were not doing the, giving the services that they were presenting to the public. So is this one of your key points? That the FTC's defendants represented to the market that LifeLock was in compliance with the settlement? That's correct, Your Honor. Where's the settlement in the record, in the excerpt of record? It actually, both sides have presented it. We have it in the, the CD. Is the settlement itself in the excerpt of record? No. The settlement is. I couldn't find it either, and I was kind of surprised. Well, if anything. Because it seems to be that that's the yardstick, the benchmark, the measurement that you're asking us to look to, to compare these things against. And I was mildly surprised not to find the settlement in the record. Well, it's in the complaint. The sections of it are in the complaint. Sections of it, but not the whole thing. Right. That's correct. The material sections of it are in the complaint. And generally, in complaints, courts don't, don't accept just wholesale putting exhibits in in support. It's rather what are the sections of the exhibit or whatever the underlying evidence is that's material to the case. And we did cite that. Where do they say we are in compliance with the settlement? They do not directly say we are in compliance. The whole point. But the point is, this Court, the Ninth Circuit, has said that you don't have to explicitly state that. You have to look at things in context. It said that. Where did we say that? You say that in Matrix. You say it in Thane. So the district court, looking at things in context, and this is the argument made by opposing counsel, points to all of the warning statements and negative disclosures that were made in their SEC filings, and says when you take the more rosy statements in the context of all these warnings, a reasonable investor would not be misled. So what's wrong with that analysis? Because you have to look at what the statements are. Both the defendants and the Court, when they're focusing on those types of statements, those are statements that are talking about the business aspect of the company, not FTC compliance. With FTC compliance, all they're basically saying is we have the agreement with the FTC, we're required to monitor. But they warn that the FTC might not agree and we might be exposed to penalties and the like. So they do have that warning. That's correct. But this, are we speaking here now about a bespeaks caution where we're giving a warning? That's for future events. At the very time they're giving that warning, they're in violation. They hadn't been, they had been doing this throttling from before the class period through the end of the class period. In violation doesn't necessarily mean that it's intentional fraud or deliberate recklessness. Am I right about that? I think that when you are, this is a unique situation. This isn't a situation where it's a new company and it's out there doing something that may be in violation, not quite sure of it. This company, when they were, when they had the original settlement with the FTC, the FTC, this very issue was given to them by the FTC. One of the complaints from the original was that LifeLock clients are, they were telling their clients and the FTC was false in the first complaint was LifeLock clients are contacted every time someone attempts to open credit in their name or change an address. That is what the throttling was stopping and wasn't doing. But how do you understand the throttling? Because it was a little difficult for me to understand exactly what that referred to. Like one of the characterizations, I guess, by opposing counsel is that they would get alerts when something not related to credit would come in, like someone with, that was registered, a sexual offender register came into the neighborhood so that the theory that they were explaining was alerts wouldn't go out when some low-priority information that didn't affect, that likely did not affect credit came in. That's exactly. Explain to me what's happening. That's exactly not the case, Your Honor. What happens is that when someone, if someone's opening up credit, if someone's using a credit card and there's some, and the agency or the company that has used the credit card alerts the LifeLock, then LifeLock contacts its customer. And then the customer, because most of this was being sold to elderly men. That's what the. The demographics. That's what the demographic of what the chief marketing officer said. Because of their age, they weren't inclined to get out of the computer and write back. They call up on a phone. So they had phone banks around the country that were taking the calls. They stopped taking the alerts in because they were getting too many calls. But that's the basic business. So they weren't giving any alerts or they weren't giving. Periods of time they weren't giving any alerts. Our confidential witness three, who ran a marketing, one of these centers for phones, said at one point it went up to three weeks. Now, it was happening consistently. They would do it for a while, then they'd start again. But they would stop it. And this was something they knew. That doesn't mean show more than just the fact that they were having problems getting their act together because this was a relatively new system. The fact that that happened doesn't mean that they did it on purpose fraudulently, does it? Your Honor, this already had happened and they were subject to a settlement from 2008. We're talking about from 2013 forward. This wasn't something they just started. They had already been in under an agreement with the FTC because this type of thing was, again, as I cited, was part of what they were told not to do. But they were doing everything they could to comply with the FTC order and correct the problem. You know, it's okay if you're trying to do everything you can, but you have to disclose it. Again, both of the two defendants in this case, Power and Davis, sold stock. Davis, 300 shares. Power, 150,000 shares throughout almost the entire class period on a regular monthly basis. My time's coming up. I just want to finish this point. Under the Dirks and Chiarella cases, which are still good law in this country, anyone who sells is required to disclose all material information or not trade. They were selling. They had an obligation to disclose material information. They told everyone on their own website that their information they were giving was complete. Now they're arguing we're not required to. But they told the public they were giving complete information. So the public, the investors, believed they were getting complete information. I'm getting a little carried away here. I'm sorry. Thank you. Thank you. May it please the Court. Boris Feldman for the Appellees. I appreciated Judge Ikuda's remarks on Judge Trott. I was acquitted of every one of those charges. Congratulations on your retirement. Actually, one of the accomplishments that didn't get mentioned was the amendment of the U.S.-U.K. Extradition Treaty for terrorists in 1986 when Judge Trott was at the Justice Department. And I was a young lawyer at the State Department who got to work with him on that. So congratulations on your retirement. Thank you. Nice to see you again. As Your Honors correctly noted, the issue here is did LifeLock represent that it was in compliance with the order? And so I'd like to focus on that statement. There is one statement in the complaint that relates to that, and it came very late in the class period. It was February 19th of 2014. Now, the class period goes back a year before that, February of 2013, and it goes on a few months later to May of 2014. Interestingly, the only lead plaintiff in the case, who's named Chet Gray, he'd made his last stock trade before then. So at the time of the alleged actionable statement, the only lead plaintiff was no longer in the market. That's in SCR 293. And the statement was made just two weeks before the first lawsuit was filed. That timing is going to matter. So you all have read many complaints in shareholder cases, and you know the format. There's a section called misleading affirmative statements, and then they say, and then the truth came out. So one would expect that for the key, the cornerstone affirmative statement here, that it would be in the section of the complaint called misleading affirmative statements. But it isn't. Instead, those are at excerpts of record 140 to 54. Instead, the statement about compliance here is in a section called the truth slowly emerges, which is at ER 154. And curiously, Judge Trott asked about the settlement agreement with the FTC. The plaintiff did not include this statement, which their case turns on, in the excerpts of records. We put it in. It's from the 10-K for 2013 at page 10. We put it in excerpt of record, I'm sorry, supplemental excerpt of record 22. The statement, which I'm going to read to you in a minute, came in the annual report to shareholders for 2013. Now, it's significant that LifeLock put the statement in the 10-K, even though the event had not occurred in 2013. It was a subsequent event in 2014, but they put it into the K anyway. And there's a section entitled governmental regulations. This is SCR 22 from the 10-K. And I'm quoting what? Roberts. SCR what? 22. 22. Got it. And what the company said is, quote, we endeavor to comply with all applicable laws and believe we are in compliance with the requirements of the FTC order, close quote. That statement is governed by a recent Supreme Court decision, Omnicare, about statements of opinion and statements of belief in compliance. Judge Bolton applied Omnicare. It had not come down at the original time of briefing, but the parties had brought it to her attention before argument. And she addressed it at length in her opinion on the second motion to dismiss. That's an excerpt of record 65 to 69. And she correctly pointed out that in Omnicare, the Supreme Court said the context of a statement of opinion matters. So let's look at that context to see whether she got it right or not. The annual report, the 10-K, mentions the FTC order 38 times. It's almost like regulatory Tourette's. They kept referring back to their FTC order. That's in the answering brief at footnote 9. We cite those 38 examples. In addition to including the disclosures under governmental regulation, the company also put it under a risk factor, captioned, we are subject to extensive government regulation which could impede our ability to market and provide our services and have a material adverse effect on our business. That's in the 10-K at page 21. And then they run through these. The plaintiffs seem to suggest that these are boilerplate. So I just want to read to you four sentences that surrounded the statement of opinion. Again, SCR 22. Quote, on January 17, 2014, we met with FTC staff at our request to discuss issues regarding allegations that have been asserted in a whistleblower claim against us relating to our compliance with the FTC order, close quote. So far from saying there's no issue here, they said a whistleblower said we're not complying, so we met with the staff. Second sentence, quote, following this meeting, we expect to receive either a formal or informal investigatory request from the FTC for documents and information regarding our policies, procedures, and practices for our services and business activities, close quote. So there's an FTC investigation coming based on the whistleblower. Third, quote, given the heightened public awareness of data breaches, as well as attention to identity theft protection services like ours, it is also possible that the FTC at any time may commence an unrelated inquiry or investigation of our business practices in our compliance with the FTC order, close quote. And then they did the sentence that's I think at the heart of the lawsuit now. Quote, we endeavor to comply with all applicable laws and believe we are in compliance with the requirements of the FTC order. So let's just take the opposing counsel's idea that the company has been advertising they're providing information about all alerts that they receive, that they consciously have a plan not to do so because they're running into difficulties in their alert center, so they have a throttling plan in place. And they know that that is contrary to their advertising and therefore inconsistent with this element order, but they don't disclose it. Now, you've given some suggestions about, well, we know we're being investigated, but Omnicare also says if you make a statement of belief but you don't really believe it, that could be a material misrepresentation. So why isn't that theory at least good enough to go forward? Your Honor, so as you know, Omnicare evaluated two elements of an opinion statement, the objective and the subjective. And I think you're focused on the subjective based on what the CW said. And that's why I began by talking about timing. The statement in the 10-Q, 10-K, sorry, was made on February 24th, February 19th, 2014. Not a single one of the CWs to whom plaintiffs attribute throttling allegations was at the company then. Who came up with this concept and this term throttling? That's internal to LifeLock, isn't it? It shows up in the complaint attributed to the CWs. It's not a term that LifeLock uses. I'm looking at the reply brief. Throttling, i.e., LifeLock's internally used term for purposefully not sending out alerts to customers, was a company policy discussed and decided on by LifeLock employees' senior management. I'm sure you saw that. I did. So is throttling something that LifeLock used to discuss the process by which it was not sending out alerts? It is without getting into facts beyond the complaint. The complaint attributes that to the CWs. Right. None of whom was at the company at the time of the 10-K. And it also attributes it, you may recall counsel talked about two lawsuits, one a wrongful term, one a whistleblower, that talked about throttling. Those people were also long gone. Burke was gone by March of 2013. Peters was gone by July or August of 2013. Did the settlement prohibit throttling? I don't believe that the settlement used that term. It talked about the company complying with its advertising obligations. So did the settlement require that all alerts be sent out, period, over and out? Instantly not. No play in the joints? I don't believe the settlement. But your advertising said that that's what you did. Yes. At least that's what opposing counsel says. And the simple ads that are in the brief say, yes, we do 24-7, 365. We get an alert and we send it on to you. So they certainly indicate that that's how the business works. But an advertising or consumer claim is not a securities fraud claim. There were different lawsuits. Right. So there's an advertisement. There's intentional not doing what you're advertising, which is what they're alleging. And those two things together violate the settlement order. So that's the argument they're making, if I understand it correctly. I think you are, Your Honor, but it's not supported by the allegations in several respects. First, in the opening brief on appeal, the appellant said, we have no way of knowing how many alerts weren't sent out in a timely way. And they try to run away from that a little bit in the reply brief. But in a company with so many customers and millions of alerts, the decisions of this Court require some indication that it was a substantial problem that would have risen to the level of a violation of the FTC decree. None of the witnesses, none of them, no matter when they were at the company, attributed to the defendants any statement or knowledge that they were violating the FTC decree. So when you ask about Omnicare, yes, if one of the defendants had said to one of the CWs, look, I know that we're in violation of the decree, but we can't really say that or the FTC will come down on us, that would call into question under Omnicare the subjective knowledge. But they have nothing like that. Remember, every CW and every whistleblower who talked about throttling was no longer at life lock when the company put out its 10-K. So a more plausible inference is that, yes, the company did not perform perfectly. They were under an FTC consent decree. And the risk factors in the 10-K make clear that they had a lot of growth problems, but that by the time they issued the 10-K in 2014, they'd made progress on it and were comfortable saying we believe we're in compliance. But that's not an insurance policy to say we believe we're in compliance. Can I ask you to briefly discuss the other issue that opposing counsel raises, which was about the wallet application? And if I understand the theory, the company did due diligence before they acquired Lemon, I think is the name of the company. And so it was known that the wallet application didn't meet the PCI standards as part of the due diligence. But nevertheless, they went ahead and bought it. And they suggest, though I'm not sure this is correct, maybe you can address it, that without the PCI compliance, the credit card manufacturers wouldn't use it, so it wouldn't do what it was intended to do. And this was not disclosed. So the wallet was essentially not valuable and, in fact, was ultimately withdrawn from the customer base. So address that as the failure to disclose. That's the other big theory. Yes, Your Honor. Lemon and wallet. So the passive voice covers many sins. So when you say it's alleged that they alleged that it was known, but by whom? It's a securities fraud case. Well, they have all the confidential witnesses saying that management was aware of that. No, actually, Your Honor, they don't. They, with respect, they say that there was extensive due diligence. They say that the CWs say that some people learned during diligence that it was not fully compliant with PCI's requirements. They say that there was a discussion of risks with the defendants, Davis and Power, but at no point does the complaint say, this CW heard Davis or Power say or heard them be told that the wallet application they were acquiring was not PCI compliant. So that's why I ask, is PCI compliance necessary for wallet to do what it was supposed to do because otherwise it wouldn't be used? If so, then I think it's a pretty powerful inference that management would have known it before they acquired the application. It had. So there's been some ledger domain in the briefing. The company, LifeLock, said we've acquired Lemon, which has wallet, which has received PCI certification. No one disputes that. It did have PCI certification. After the acquisition closed, either late in the class period or after the class period, LifeLock learned that the wallet app actually retained your little code number when you enter a credit card, and it wants the number, the date, and then the secret code, the CVCC. And it retained that, and it shouldn't retain that for PCI compliance. But that doesn't alter the fact that it had PCI compliance at the time they brought it. It's important to note that there's no allegation in the complaint or from any CW that there was any breach or loss of any customer information as a result of that formal noncompliance with PCI. The final point I want to make, and I know I'm out of time, the plaintiffs threw up sort of plaintiff's favorite mode of stock sales. If you look, and that's, I guess, the way to end the timing. So between the 10K and the first complaint being filed was two weeks. The 10K was on February 19th.  Why on earth would you infer a strong inference to see enter that LifeLock was lying about its belief in compliance that late in the class period? And counsel's answer was, well, they sold a lot of stock. In our answering brief at page 50, notes 43 and 44, we analyzed the public data in the record, which shows that every trade was made pursuant to a rule 10B51 plan. So you can invoke Chiarella, Dirks, Magna Carta, and any other rule of law. They were made pursuant to a 10B51 plan long before. And moreover, we looked at the numbers. The vast majority of those trades were before the 10K was filed, not after. So if you're asking yourself, in a way, every 10B5 pleading motion under the Reform Act comes down to, does this case have a plausible inference of fraud? And I suggest, Your Honor, that this one does not. Thank you. Okay. We have a minute for rebuttal. Well, there's a lot to address, but let me try to get through some of it. First, on the issue about the stock sales, you can cherry-pick the last statement and talk about stock sales. They started the stock sales throughout the class period. We allege violations, misrepresentations in the 2012 form 10K, which was issued on February 26, 2013. And in the complaint, we have March 30, 2013, May 30, 2013, June 28, 2013, July 2013. There's a series of statements, and they're doing the stock sales during that period. It doesn't just address one statement. The other thing is, again, I get back to the issue. The Court, if you are making a statement and at the current time the facts are otherwise, you have to disclose them. You can be talking about all the things that may happen if the FTC finds us in violation. But at the time you're making that statement, if you know a material issue, and this is a very material issue, the company was described as an alert company, and you're not giving alerts, that goes to the heart of the case. I mean, that's not the kind of thing, this is not some small aspect of it. And we do allege that with respect to the PCs, the Lemon. Confidential informant 4 says she was on the due diligence committee, and during their due diligence, they found out that it wasn't PCI-compliant. Roberts. Who's the they? The people on the due diligence, and she. She went and the main statement was they made a presentation to the, to the, to the executive leadership board, which consists of five members, including Davis and Power. And at that meeting, she described to them the pros and cons of acquiring Lemon and that the wallet app was not PCI-compliant. That's in ER 130 to 131, paragraphs 161 to 163 of our amended complaint. And Judge Bolton says, and I'm talking from the excerpt 035, even assuming that CAC adequately pleads that defendants made a misleading statement concerning LifeLock's compliance with the applicable PCI security standards in the context of promoting its mobile wallet application, the CAC fails to adequately plead that this statement was made with cyander. No specific allegation that the individual defendants had actual knowledge that the mobile wallet application was not PCI-compliant or that defendants were in a position to discover that violation without extraordinary effort at the time the statement was made. None of the CAC's allegations based on observations of former employees or confidential witnesses supports an inference of cyander because each of these individuals either stopped working for LifeLock before LifeLock acquired the wallet or has not claimed to have personal knowledge of any aspect of the mobile wallet applications. And then in footnote 7, they say on May 16, 2014, you know what it says, the form 8K says we've determined that certain aspects of the Lemon wallet, which we acquired as part of our acquisition of Lemon, are not fully compliant. So where is she off the rails there? She's off the rails because as I just cited, confidential witness 4 was part of the due diligence team acquiring Lemon. She gave a presentation and told, at which Davis and Power were present, and told them that it was not PCI-compliant. But it doesn't exactly say that, does it? It says CW4 stated that once the due diligence teams gathered their research and data, they presented their findings to the executive leadership board. No statement about PCI or that she was present there. 64, CW4 confirmed that the fact that the wallet was not PCI-compliant came up in discussions with the executive leadership board. But no first-person witnessing of it. Well, the executive leadership board is comprised of Davis and Power. She doesn't say that she was there, that she heard it being presented to them. I mean, that seems to be what the district court was concerned about, was the artful drafting, whereas CW4 isn't. Well, she says in our next paragraph, CW4 said Davis and the other executives were aware of all the risks of acquiring Lemon. The risks were discussed openly internally. Specifically, the entire executive leadership board discussed 10 to 20 risks involved with the purchase of Lemon. She was at that meeting, at the meeting. So the court thought it was artful drafting, and you're saying it was just mistaken drafting, and it could have been drafted to say she was at those meetings, she heard this information being given to Davis and Power. Is that what you're saying? Yes. I mean, the way we present this is the way that we get it from the witness. We can't put words into their mouth. She was telling us she was at the meeting, making the presentation to the executive leadership board. We've taken you way over your time, so you can wrap up. I know. I wish I had another 10 minutes. Okay. Thank you, Your Honor. So just to wrap up, we do believe that we've stated and supported our cause of action and that there were material misrepresentations made with Scientia so that the men in the complaint should be sustained, and the alternative, we would believe that the Rule 60B should have been sustained, should have been granted. Thank you very much, Your Honors. We thank both sides for their argument. The case of Gravy Life Flock, Inc. is submitted, and we are adjourned for this session and for the week. Thank you.
judges: Trott, Ikuta, Faber